# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. **CR-24-56-J** |
| | ) | |
| GLORIA LESHELL BILLS, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT GLORIA LESHELL BILLS'S MOTION TO SUPPRESS TRAFFIC STOP

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

*s/ Matthew P. Anderson*
MATTHEW P. ANDERSON
Bar Number: 30472
Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8788 (Office)
(405) 553-8888 (Fax)
matthew.anderson2@usdoj.gov

i

## TABLE OF CONTENTS

FACTUAL BACKGROUND ........................................................................... 1

ARGUMENT ................................................................................................ 7

I.     FEDERAL RULE OF CRIMINAL PROCEDURE 12(b) LIMITS THE
SCOPE OF DEFENDANT'S CHALLENGE. ............................................ 7

II.    DEFENDANT IS NOT ENTITLED TO AN EVIDENTIARY
HEARING. ........................................................................................... 9

III.   THE TRAFFIC STOP WAS SUPPORTED BY REASONABLE
SUSPICION ........................................................................................ 11

        a.    The Collective Knowledge Doctrine Authorizes Reliance on
Information from Other Officers. ....................................... 13

        b.    The Traffic Stop Was Supported by Reasonable Suspicion of an
Observed Traffic Violation. ................................................ 14

        c.    The Traffic Stop Was Supported by Reasonable Suspicion that
Defendant Was Engaged in Drug Trafficking. ................... 15

IV.   THE TRAFFIC STOP WAS NOT PROLONGED BY ANY DELAY
IN THE ARRIVAL OF THE K9 TEAM. ................................................ 16

V.    LAW ENFORCEMENT HAD PROBABLE CAUSE TO SEARCH
THE VEHICLE. .................................................................................. 17

        a.    Defendant Has Waived Any Argument Related to the Lack of
Probable Cause. .................................................................. 17

        c.    Probable Cause Existed Based on the Odor of Marijuana. .............. 19

        d.    Probable Cause Existed Based on the Positive Alert from the
K9. ..................................................................................... 20

CONCLUSION ............................................................................................ 23

CERTIFICATE OF SERVICE ...................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

568 U.S. 237 (2013) ..................................................................................... 24

2020 WL 2167185 (W.D. Okla. May 5, 2020) ............................................. 14

*Alabama v. White*,
    496 U.S. 325 (1990) ................................................................................. 15

*Illinois v. Wardlow*,
    528 U.S. 119 (2000) ................................................................................. 15

*Navarette v. California*,
    572 U.S. 393 (2014) ........................................................................... 15, 19

*Ornelas v. United States*,
    517 U.S. 690 (1996) ................................................................................. 20

*State v. Roberson*,
    492 P.3d 620 (Okla. Crim. App. 2021) ................................................... 23

*United Sates v. Harrelson*,
    705 F.2d 733 (5th Cir. 1983) ................................................................... 13

*United States v. Alvarez*,
    542 F.Supp.2d 597 (W.D. Tex. 2008) ..................................................... 13

*United States v. Arvizu*,
    534 U.S. 266 (2002) ................................................................................. 15

*United States v. Barajas-Chavez*,
    358 F.3d 1263 ........................................................................................... 10

*United States v. Botero-Ospina*,
    71 F.3d 783 (10th Cir. 1995) .............................................................. 15, 17

*United States v. Boykins*,
    No. CR-23-306-SLP, 2024 WL 101865 (W.D. Okla. Jan. 9, 2024) ........... 23

*United States v. Burciaga*,
    687 F.3d 1229 (10th Cir. 2012) ............................................................... 17

*United States v. Burke,*
    633 F.3d 984 (10th Cir. 2011) ................................................................ 11, 12

*United States v. Chavez,*
    534 F.3d 1338 (10th Cir. 2008) ...................................................... 16, 17, 18

*United States v. Chavez-Marquez,*
    66 F.3d 259 (10th Cir. 1995) .............................................................. 12, 13

*United States v. Cline,*
    349 F.3d 1276 (10th Cir. 2003) ........................................................... 17, 18

*United States v. Cortez-Galaviz,*
    495 F.3d 1203 (10th Cir. 2007) ........................................................... 18, 19

*United States v. Downs,*
    151 F.3d 1301 (10th Cir. 1998) ........................................................... 20, 23

*United States v. Eckhart,*
    569 F.3d 1263 (10th Cir. 2009) ................................................................ 17

*United States v. Gambino-Zavala,*
    539 F.3d 1221 (10th Cir. 2008) ................................................................ 10

*United States v. Glass,*
    128 F.3d 1398 (10th Cir. 1997) ................................................................ 13

*United States v. Karam,*
    496 F.3d 1157 (10th Cir. 2007) ................................................................ 14

*United States v. Lopez,*
    518 F.3d 790 (10th Cir. 2008) ........................................................... 15, 19

*United States v. Martinez,*
    910 F.3d 1309 (10th Cir. 2018) ........................................................... 14, 15

*United States v. McCargo,*
    464 F.3d 192 (2d Cir. 2006) ................................................................... 24

*United States v. McGehee,*
    672 F.3d 860 (10th Cir. 2012) ................................................................. 20

*United States v. Melendez-Garcia,*
    28 F.3d 1046 (10th Cir. 1994) ................................................................. 25

*United States v. Moore,*
  795 F.3d 1224 (10th Cir. 2015) ....................................................... 14

*United States v. Morin,*
  949 F.2d 297 (10th Cir. 1991) ......................................................... 23

*United States v. Pettigrew,*
  468 F.3d 626 (10th Cir. 2006) ......................................................... 13

*United States v. Ramirez,*
  473 F.3d 1026 (9th Cir. 2007) ......................................................... 17

*United States v. Riddle,*
  731 F. App'x 771 (10th Cir. 2018) ................................................... 14

*United States v. Vance,*
  893 F.3d 763 (10th Cir. 2018) ....................................................9, 10, 11

*United States v. Vqsquez-Castillo,*
  258 F.3d 1207 (10th Cir. 2001) ....................................................... 20

*United States v. Walczak,*
  783 F.2d 852 (9th Cir. 1986) ........................................................... 13

*United States v. West,*
  219 F.3d 1171 (10th Cir. 2001) ....................................................... 23

*United States v. White,*
  584 F.3d 935 (10th Cir. 2009) ....................................................24, 25

*United States v. Whitley,*
  680 F.3d 1227 (10th Cir. 2012) .............................................15, 16, 17, 18

*United States v. Wilson,*
  115 F.3d 1185 (4th Cir. 1997) ......................................................... 11

*United States v. Woods,*
  995 F.2d 713 (7th Cir. 1993) ........................................................... 13

*Whren v. United States,*
  517 U.S. 806 (1996) ....................................................................... 14

## Statutes

18 U.S.C. § 924(c)(1)(A) ................................................................................. passim

21 U.S.C. § 841(a)(1)................................................................................................ 2

21 U.S.C. § 846 ...................................................................................................... 1

## Rules

Fed. R. Crim. P. 12(c)(3) ...................................................................................... 11

Fed. R. Crim. P. 12(d)........................................................................................... 12

FEDERAL RULE OF CRIMINAL PROCEDURE 12(b)................................................i, 9

Federal Rule of Criminal Procedure 12(b)(3)(C) .................................................. 9

The United States of America, by Robert J. Troester, United States Attorney for the Western District of Oklahoma, and Matthew P. Anderson, Assistant United States Attorney, hereby responds in opposition to Defendant Gloria Leshell Bills's Motion to Suppress Evidence [Doc. 77].

Defendant seeks "suppress both the vehicle stop and seizure of evidence" resulting from the traffic stop," but Defendant fails to offer any facts to support her theory of exclusion. Furthermore, Defendant fails to address the actual facts of the traffic stop. Instead, Defendant claims that the Government did not produce the relevant discovery, despite such discovery being provided by the Government forty days prior to the filing of the motion. (*See* Doc. 78.) By failing to address the factual circumstances of the stop, search, and detention of Defendant, Defendant has failed to present any factual disputes. Because there are no factual disputes, there is no need for an evidentiary hearing, and Defendant's motion should be denied.

## FACTUAL BACKGROUND

On February 8, 2024, a federal Grand Jury returned an indictment naming four defendants, including Gloria Leshell Bills. (Doc. 37.) Defendant is named in three counts, in which she is charged with: (i) conspiring to possess with the intent to distribute and to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 846; (ii) possessing with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and (iii) possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). (*Id.*) While Count One is

1

alleged to have occurred between December 2023 and January 9, 2024, both Count Five and Six are alleged to have occurred on January 9, 2024. (*See* Doc. 1.).

On January 9, 2024, at approximately 1:25 p.m., the Oklahoma Bureau of Narcotics (OBN) began surveillance at the Hospitality Inn (the "Inn") located at 3709 NW 39th Street, Oklahoma City, Oklahoma. (*See* Exhibit 1 at 1.) During surveillance, OBN observed a silver Chrysler 200 arrive at the Inn and park next to a white Jeep Compass. (*Id.*) The driver of the silver Chrysler 200 was later identified as Logan Eugene Stapleton, and the white Jeep Compass was known to be driven by Sarah Christine Annesley. (*Id.*) After observing Stapleton walk between his vehicle and the north breezeway of the Inn, OBN agents observed Stapleton and Annesley "emerge from the north breeze way" and walk to their vehicles. (*Id.* at 1-2.) OBN agents observed Stapleton "place something inside the trunk of the silver Chrysler before getting into the drivers [*sic*] seat" and watched Annesley enter her vehicle as well. (*Id.* at 2.) Both Stapleton and Annesley departed the Inn. (*Id.*)

OBN agents maintained surveillance on Stapleton after he departed the Inn. (*Id.*) OBN agents ultimately requested assistance from the Criminal Interdiction Team of Central Oklahoma (CITCO) to conduct a traffic stop on Stapleton. (*Id.*) At approximately 2:03 p.m., CITCO conducted a traffic stop on Stapleton's vehicle. (*Id.* at 3.) During a subsequent search of Stapleton's vehicle, law enforcement located approximately 10,101.47 grams of suspected methamphetamine inside the trunk of the vehicle. (*Id.*) The methamphetamine was located inside clear plastic bags, which were stored inside a white and blue Marshalls bag. (*Id.*) The traffic stop was concluded by 2:23 p.m. (*Id.*)

Following the traffic stop, OBN and Drug Enforcement Administration (DEA) agents established surveillance at Annesley's residence, the Newport Granada Apartments located at 3407 NW 39th Street, Oklahoma City, Oklahoma.[1] (Exhibit 2.) Agents observed Annesley's white Jeep at that address. (*Id.*) During surveillance, agents observed Annesley depart her residence and drive to the Inn. (*Id.*) At approximately 3:00 p.m., a DEA agent observed Annesley's vehicle parked next to a red Toyota Camry with a Choctaw Nation tribal tag, 04859CH. (*Id.*) The DEA agent subsequently observed Annesley walk in the vicinity of room 118 on the Inn. (*Id.*) At approximately the same time, the passenger of the red Toyota (later identified as Mondale Larue Golston) exited the vehicle and followed Annesley in the direction of room 118. (*Id.* at 1-2.)

Law enforcement then observed Golston and Annesley "walking away from the vicinity of room 118." (*Id.* at 2.) Law enforcement observed Golston return to his vehicle and place a Marshalls shopping bag in the passenger side of the red Toyota. (*Id.*) Golston and Annesley spoke with each other as they walked away. (*Id.*)

After Golston re-entered the red Toyota and departed, OBN and DEA agents maintained surveillance before requesting a traffic stop. (*Id.*) This occurred at approximately 3:09 p.m. (Exhibit 3[2] at 1.) At the time of the request, OBN and DEA agents specifically conveyed that the traffic stop would be for purposes of a drug investigation.

---

[1]    Based on results from Google Maps, the Newport Granada Apartments are less than a half mile from the Inn.

[2]    Exhibit 3 is the radio logs from the traffic stop of Defendant and Golston. Despite Defendant's claim to the contrary (Doc. 79), these records were produced to defense counsel on April 5, 2024.

(*Id.*) At 3:09 p.m., the Oklahoma City Police Department (OCPD) call logs note that the request was "for drug related traffic stop." (*Id.*) At 3:17 p.m., the OCPD call logs note that "OHP is also getting involved" and "will do felony stop if get there first." (*Id.*) At the same time, OCPD is told to "treat it like a traffic stop."[3] (*Id.*) As noted in a report of the traffic stop, an OCPD officer "heard over the radio undercover officers were requesting assistance with a vehicle they believed was being used in drug distribution." (Exhibit 4 at 4.)

As agents maintained surveillance on the red Toyota, they would provide updates over the radio to OCPD units. (*See generally* Exhibit 3.) At 3:14 p.m., agents noted that the red Toyota was on southbound I-235 at the 6th Street exit. (*Id.* at 1.) At that portion of I-235, the speed limit is 60 mph. At 3:15 p.m., agents informed OCPD that the red Toyota was exceeding the speed limit by travelling at 69 mph and was not signalling as it changed lanes. (*Id.*; *see also* Exhibit 4 at 4.) At approximately 3:20 p.m., the red Toyota was at eastbound I-40 and Sooner Road when a traffic stop was initiated. (Exhibit 3 at 1; Exhibit 4 at 4.) The red Toyota exited the interstate and came to a stop at a red light on the service road for I-40 at S. Sooner Avenue. (Exhibit 4 at 4.)

When he approached the red Toyota, Officer Clifford Beloncik detected "a strong odor of what [he] knew to be green marijuana coming from the recently rolled down window." (Ex. 4 at 3.) Sgt. Beloncik "had previously not smelled the marijuana odor in the air." (*Id.*) Officer Colton Layman made a similar observation. After Defendant was placed

---

[3]     The reason law enforcement would treat a drug-related, felony traffic stop as a traffic stop is to avoid alerting co-conspirators, such as Annesley, as to law enforcement's knowledge of the drug trafficking activities.

in the back of Sgt. Bryan Hoffman's patrol vehicle, Officer Layman made contact with her to ask for consent to search the vehicle. (*Id.*) After she denied, Officer Layman approached the red Toyota and "smelled a strong odor of marijuana and [he] also saw white containers commonly used in the sale of marijuana." (*Id.*)

OBN Agent David Jehle was also present on the scene after OCPD stopped the vehicle. (*See* Exhibit 2 at 2.) Agent Jehle "approached the vehicle after marked units had stopped it and could see a Marshalls bag on the front passenger floorboard." (*Id.*) This Marshalls bag was in plain view of the officers when they removed Golston from the vehicle. (*See* Exhibit 5-6.[4]) Agent Jehle recognized the Marshalls bag as the "same type" of bag that contained approximately 10 kilograms of methamphetamine in Stapleton's vehicle after Stapleton had met with Annesley. (Exhibit 2.)

Approximately three or four minutes after the traffic stop began, a request was made for a drug detection K-9. (*See* Exhibit 3 at 2 (noting that traffic stop occurred at approximately 3:21 p.m. and request for drug dog occurred at approximately 3:24 p.m.).) Another request was made by Agent Jehle at approximately 3:31 p.m. (*See* Exhibit 7.) At approximately 3:44 p.m., Oklahoma County Sheriff Deputy Jason P. Hefley arrived and noted that the vehicle was parked at an intersection with busy traffic. (*Id.*) Deputy Hefley deployed his K-9 partner around the vehicle, but he determined that his K-9 was distracted by the traffic and surrounding officers. (*Id.*) Deputy Hefley determined this based on the

---

[4]     Exhibit 5 is the body camera footage from Sgt. Beloncik from the time of the stop until Golston and Defendant were secure in patrol vehicles. Exhibit 6 is a still image taken from the body camera footage from approximately 2:07 into the footage contained in Exhibit 5.

fact that the K-9 was "looking around and wasn't close to the vehicle sniffing" despite Deputy Hefley being able to "smell an odor of marijuana emitting from the open window." (*Id.*)

Deputy Hefley's body camera footage shows the K-9 having difficulty staying on task. (*See* Exhibit 8.) At approximately 43 seconds into the video, Deputy Hefley abandons the attempt on the vehicle and walks back to a group of officers nearby. (*Id.* at 00:43.) As Deputy Hefley walks back, he states "I'm not getting nothing on this one." (*Id.* at 00:47.) In response, Agent Jehle, Sgt. Beloncik, and Deputy Hefley all confirm that they detected the odor of marijuana, and Sgt. Beloncik notes that when Golston rolled down the window he could smell marijuana coming from the car. (*Id.* at 00:47-01:00.) Agent Jehle states that the officers have probable cause (or "are good") based on the odor of marijuana combined with the fact that they knew, based on the day's activities, what was in the Marshalls bag. (*Id.* at 01:28-01:35.)

Ultimately, the officers decide to move the vehicle to a less crowded area in order to attempt the K-9 sniff again. (*See* Exhibit 9.) After relocating, the K-9 alerted on the vehicle by "bracketing" the passenger side of the vehicle, and Deputy Hefley informed the other officers as such. (*Id.* at 00:30-01:39.) After the positive alert, Agent Jehle retrieved the Marshalls bag from the vehicle and seized the methamphetamine. (*Id.* at 02:55-03:00.) The methamphetamine was subsequently field tested presumptively positive for methamphetamine with a weigh of approximately 7,082.4 grams. (Exhibit 2 at 2-3.) Law enforcement further located a firearm inside a purse in the vehicle. (*Id.* at 3.)

**ARGUMENT**

I.   **FEDERAL RULE OF CRIMINAL PROCEDURE 12(b) LIMITS THE SCOPE OF DEFENDANT'S CHALLENGE.**

Under Federal Rule of Criminal Procedure 12(b)(3)(C), a defendant is obligated to file a pretrial motion for suppression, and the failure to do so timely constitutes a waiver of any argument not raised pre-trial. *See United States v. Vance*, 893 F.3d 763, 769-70 (10th Cir. 2018). But a defendant does not avoid waiver simply by filing a generic pretrial suppression motion that does not identify the grounds for relief. "This waiver rule applies not only when a defendant fails to file a pretrial motion to suppress, but also when a defendant fails to assert a particular argument in a pretrial suppression motion." *Id.* (citing *United States v. Gambino-Zavala*, 539 F.3d 1221, 1227 n.2 (10th Cir. 2008)). A defendant does not avoid waiver by filing a general, non-specific motion that applies to all aspects of a stop. Instead, "[t]o avoid waiving a particular argument, the party must make 'sufficiently definite, specific, detailed, and nonconjectural factual allegations supporting his suppression claim' in his pretrial motion.'" *Id.* (quoting *Gambino-Zavala*, 539 F.3d at 1227 n.2)); *see also United States v. Barajas-Chavez*, 358 F.3d 1263, 1266 (10th Cir. 2004 (noting a defendant must "set forth plainly in his pre-trial motions the grounds upon which he seeks relief").

Even where the United States bears the burden to demonstrate that law enforcement's warrantless actions were justified, a defendant still "must make 'sufficiently definite, specific, detailed and nonconjectural factual allegations supporting his suppression claim' in his pretrial motion." *Vance*, 893 F.3d at 770 (quotation omitted). In

*Vance*, the defendant filed a motion to suppress challenging law enforcement's interpretation of a traffic law. *See id.* at 766-67. When the defendant sought to expand his challenge, the court found that he had waived this argument under Rule 12(b)(3)(C) because he failed to make "sufficiently definite, specific, detailed and nonconjectural factual allegations supporting" this argument. *Id.* at 769-70.

Defendant failed to comply with Rule 12(b)(3)(C) because she has failed to make any argument with sufficient specificity and has failed to support her argument with nonconjectural factual allegations. Instead, Defendant makes the incorrect statement that the Government failed to produce the justification for the traffic stop, and therefore there was no justification. Defendant further claims that the Government failed to disclose the length of the traffic stop. These claims are incorrect. As set forth in the discovery produced on April 5, 2024, and as a further discussed below, law enforcement had reasonable suspicion of both drug trafficking and a traffic violation at the time of the stop. Further, law enforcement had probable cause to conduct a search and seizure of Defendant's vehicle prior to the arrival of the K-9 unit. Defendant's blanket denials of factual authority are not the same as the necessary "sufficiently definite, specific, detailed and nonconjectural factual allegations supporting" her argument. *Vance*, 893 F.3d at 769-70.

Defendant cannot rescue her failure in her motion by now referring to discovery materials available to her at the time of her initial motion. In order to raise new grounds that were not made as part of a timely motion, a defendant must demonstrate good cause. Fed. R. Crim. P. 12(c)(3). The Tenth Circuit notes that, at the appellate level, they "rarely . . . grant relief under the good cause exception." *United States v. Burke*, 633 F.3d

984, 988 (10th Cir. 2011); *see also United States v. Wilson*, 115 F.3d 1185, 1191 (4th Cir. 1997) (rejecting a good cause argument when "[t]he record shows that sufficient information was available to defense counsel before trial that would have enable him to frame his suppression motion to include the execution of the search warrant" (cited in *Burke*, 633 F.3d at 988)).[5] As such, Defendant has waived any argument not presented in her initial motion.

Due to Defendant's failure to present "definite, specific, detailed and nonconjectural factual allegations," the United States does not have notice about what aspect of the stop Defendant claims is improper beyond a blanket denial of reasonable suspicion. Allowing a defendant to proceed on a generic motion to suppress would make the Tenth Circuit's precedent requiring these definite and specific allegations a nullity and would allow a defendant to avoid waiver by simply not identifying any argument at all. A defendant who files a generic motion to suppress and simply shifts the burden to the United States to defend all aspects of the stop. By failing to identify any argument for suppression and by failing to support that argument with "definite, specific, detailed and nonconjectural factual allegations," Defendant has waived ***all*** arguments supporting suppression.

## II.    DEFENDANT IS NOT ENTITLED TO AN EVIDENTIARY HEARING.

Defendant has not established the need for an evidentiary hearing because they have not identified any factual dispute that requires resolution. As noted in Defendant's Motion,

---

[5]    The only material produced to Defendant following the filing of her motion was the Oklahoma Council on Law Enforcement Education & Training (CLEET) certificate for the CDS Detector K9 Team utilized in this case as well as excerpt of the K9 Team's training.

a hearing is only required "[w]hen factual issues are involved in deciding a motion." (Doc. 77 at 3 (quoting Fed. R. Crim. P. 12(d)); *see also United States v. Chavez-Marquez*, 66 F.3d 259, 261 (10th Cir. 1995) (holding that a trial court is only required to hold a suppression hearing "when a defendant presents facts justifying relief" (quoting *United States v. Woods*, 995 F.2d 713, 715 (7th Cir. 1993))).

It is the defendant's burden of showing disputed issues of material fact. *Chavez-Marquez*, 66 F.3d at 261. A defendant only meets this burden if the motion to suppress "raise[s] factual allegations that are 'sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the [stop and] search are in issue.'" *Id.* (quoting *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986)). A defendant is required to establish a factual dispute because "[e]videntiary hearings on motions to suppress are 'designed for the presentation of evidence in support of factual allegations which, if proven, would justify the relief sought.'" *United States v. Alvarez*, 542 F.Supp.2d 597, 599 (W.D. Tex. 2008) (quoting *United Sates v. Harrelson*, 705 F.2d 733, 738 (5th Cir. 1983)).

In the present motion, Defendant does not offer any facts of her own in support of the motion. Instead, Defendant makes three conclusory allegations and claims a lack of discovery. (Doc. 77 at 3.) However, Defendant had access to all necessary discovery prior to filing her motion. Defendant does not make any affirmative factual allegations or point to any evidence that would support her relief. As a result, the Court is not left with a "dispute over the facts and the only issue [is] their legal significance." *United States v. Glass*, 128 F.3d 1398, 1409 (10th Cir. 1997). In such cases, there is no need for an

evidentiary hearing. *Id.*; *United States v. Pettigrew*, 468 F.3d 626, 637 (10th Cir. 2006) ("An evidentiary hearing may be appropriate when there are material facts in dispute relevant to the motion to suppress" but is not necessary when the facts are not in dispute. (citation omitted)); *United States v. Hunt*, No. 19-cr-73-R, 2020 WL 2167185, at *4 (W.D. Okla. May 5, 2020) (citing *United States v. Riddle*, 731 F. App'x 771, 780 (10th Cir. 2018)).

Rather than providing specific, disputed factual allegations that would support the suppression motion, Defendant has filed a generic motion to suppress and demands, without citing any legal authority, an evidentiary hearing where she may engage in a fishing expedition. The Court should deny Defendant's motion to suppress without an evidentiary hearing because there is no factual dispute.

If the Court is inclined to grant an evidentiary hearing, the Court should require Defendant to file a statement of expected facts that would be developed at an evidentiary hearing prior to such a hearing. Otherwise, it appears that Defendant is using this sparse motion to suppress as an improper discovery tool prior to trial, and the automatic granting of an evidentiary hearing would result in this continued practice even when no grounds for suppression are present.

## III.   THE TRAFFIC STOP WAS SUPPORTED BY REASONABLE SUSPICION.

A routine traffic stop is considered a seizure under the Fourth Amendment, and therefore all traffic stops must be reasonable. *United States v. Martinez*, 910 F.3d 1309, 1313 (10th Cir. 2018); *see also Whren v. United States*, 517 U.S. 806, 809-10 (1996). "A traffic stop is reasonable if it is (1) justified at its inception and (2) reasonably related in

scope to the circumstances which justified the interference in the first place." *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015) (quoting *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007). A law enforcement officer may stop a vehicle for two reasons. *First*, "a traffic stop is justified if the officer observes or reasonably suspects a traffic or equipment violation." *Martinez*, 910 F.3d at 1313 (citing *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)). *Second*, "a law-enforcement officer may also stop a vehicle if the officer harbors 'a reasonable suspicion that [other] criminal activity may be afoot.'" *Id.* (quoting *United States v. Whitley*, 680 F.3d 1227, 1233 (10th Cir. 2012)) (alteration in *Martinez*).

Whether based on a traffic violation or suspicion of criminal activity, an officer only needs "reasonable suspicion" to justify the stop. "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of the information possessed by police and its degree of reliability.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). This standard incorporates the "totality of the circumstances" and requires a level of suspicion "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than what is required for probable cause. *Id.* (citations omitted). Notably, "[a] determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). "Officers merely need an articulable reasonable suspicion that criminal activity may be afoot—they need not even assert a "fair probability" that their

investigation will actually turn up evidence of criminal activity." *United States v. Lopez*, 518 F.3d 790, 799 (10th Cir. 2008).

In this case, the traffic stop was supported by ***both*** a reasonable suspicion that a traffic violation occurred ***and*** a reasonable suspicion that Defendant was engaged in drug trafficking.

### a. The Collective Knowledge Doctrine Authorizes Reliance on Information from Other Officers.

Whether based on reasonable suspicion of a traffic violation or reasonable suspicion of drug trafficking, the officer who made the stop had not observed the violation. However, "an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *Whitley*, 680 F.3d at 1234 (citing *United States v. Chavez*, 534 F.3d 1338, 1345-46 (10th Cir. 2008)).

In *Chavez*, a state law enforcement officer conducted a traffic stop at the direction of federal agents with the DEA. *Chavez*, 534 F.3d at 1341-42. The federal agents did not communicate the extent of their investigation, but they told the state officer that the vehicle had drugs. *Id.* The federal agents further asked the state officer "to develop his own probable cause for stopping the vehicle." *Id.* at 1341. The defendant challenged the stop and argued that a state officer could not rely on the federal agents' probable cause unless they "communicated the substance of the DEA's suspicions." *Id.* at 1347. The Tenth Circuit rejected this argument and held that, even without supplying the substance of the probable cause:

> Patrolman Chavez acted on the strength of the DEA's probable cause when he stopped and searched Mr. Chavez's truck. He merely supplied a cover story (the putative headlight infraction) that would mask the basis for his alternative probable cause (the drug trafficking). "[D]isguising the stop as a 'traffic stop' was a valid law enforcement tactic calculated to ensure an officer's safety," [*United States v. Ramirez*, 473 F.3d 1026, 1038 (9th Cir. 2007)] (Kozinski, J., concurring), and safeguard the CS's identity and the integrity of the DEA investigation.

*Id.* at 1348; *see also Whitley*, 680 F.3d at 1234 ("[A]n officer with reasonable instruction may instruct another officer to make a *Terry* stop without communicating the basis for the stop, so long as the communicating officer has reasonable suspicion to make the stop himself.").

**b.     The Traffic Stop Was Supported by Reasonable Suspicion of an Observed Traffic Violation.**

When the basis for the stop is a traffic violation, the Fourth Amendment requires that a stop be justified "based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009) (quoting *United States v. Botero–Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (en banc)). The United States bears the burden of "establishing by a preponderance of the evidence that reasonable suspicion supported the officer's stop of Defendant's vehicle." *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012). However, any single traffic violation is sufficient to initiate the traffic stop. *United States v. Cline*, 349 F.3d 1276, 1287 (10th Cir. 2003).

Officers observed two violations that supported the traffic stop in this case. *First*, law enforcement observed Defendant travelling at 69 mph in a 60-mph zone. (Exhibit 3 at 1; Exhibit 4 at 4.) Exceeding the posted speed limits is a violation of Oklahoma law. *See*

Okla. Stat. tit. 47, § 11-801. *Second*, law enforcement observed Defendant change lanes without signaling. (Exhibit 3 at 1; Exhibit 4 at 4.) Changing lanes without a prior signal is a violation of Oklahoma law. *See* Okla. Stat. tit. 47, § 11-309(2).

Any single traffic violation identified above would have been sufficient to initiate the traffic stop. *Cline*, 349 F.3d at, 1287 (noting that a law enforcement officer needs "only an articulable suspicion that a traffic violation had occurred" to justify an initial stop of a vehicle). As such, the traffic stop was justified at its inception.

**c.   The Traffic Stop Was Supported by Reasonable Suspicion that Defendant Was Engaged in Drug Trafficking.**

Although law enforcement had reasonable suspicion of a traffic offense, the actual basis for the stop was law enforcement's reasonable suspicion (at a minimum) that Defendant and Golston were engaged in drug trafficking. A traffic stop is authorized even in the absence of an observed traffic violation when an officer has "reasonable suspicion of criminal activity unrelated to a traffic offense." *Whitley*, 680 F.3d at 1233 (citation omitted). In the case of drug trafficking, "an officer may stop a car if he has either a reasonable, articulable suspicion or probable cause to believe that the car is carrying contraband." *Chavez*, 534 F.3d at 1343-44 (citing *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1205-06 (10th Cir. 2007)).

On January 9, 2024, OBN and DEA observed two separate transactions occur at the Inn. (*See* Exhibits 1-2.) In the first transaction, OBN observed Stapleton and Annesley meet for a short period of time before observing Stapleton place something in the trunk of his vehicle. (Exhibit 1 at 1-2.) A subsequent traffic stop resulted in the seizure of

approximately 10 kilograms of methamphetamine contained inside a white and blue Marshalls bag. (*Id.* at 3.) This traffic stop and search happened between 2:03 p.m. and 2:23 p.m. (*Id.*)

Less than an hour later, OBN and DEA observed the second transaction. (*See* Exhibit 2.) In this instance, agents observed Annesley arrive at the Inn and park next to Defendant and Golston's vehicle. (*Id.* at 1.) Annesley and Golston both exited their vehicles and proceeded to the vicinity of room 118 of the Inn. (*Id.* at 1-2.) When Golston returned, he was carrying a Marshalls shopping bag and placed in the passenger side of the red Toyota. (*Id.* at 2.) Golston and Annesley were talking to each other as they both walked away. (*Id.*)

Determining whether reasonable suspicion exists incorporates the "totality of the circumstances" and requires a level of suspicion "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than what is required for probable cause. *Navarette*, 572 U.S. at 397 (citations omitted). The United States submits that the observed interactions between Golston and Annesley—particularly in light of the mirrored circumstances between Stapleton and Annesley—rise to the level of probable cause. However, it is clear that it presents "an articulable reasonable suspicion that criminal activity may be afoot" to support the stop. *Lopez*, 518 F.3d at 799.

## IV.   THE TRAFFIC STOP WAS NOT PROLONGED BY ANY DELAY IN THE ARRIVAL OF THE K9 TEAM.

Because the original justification for the traffic stop was for the investigation of drug trafficking, there is no concern about the duration of the traffic stop. The Fourth

Amendment does require that an investigatory detention be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. McGehee*, 672 F.3d 860, 867 (10th Cir. 2012) (quotation marks and citation omitted). Because the investigatory detention in this case was for the purpose of investigating drug trafficking, any period waiting for a K9 Team would be "reasonably related" to that initial purpose. Further, as discussed below, law enforcement had probable cause to search the vehicle prior to the arrival of the K9 Team.

## V. LAW ENFORCEMENT HAD PROBABLE CAUSE TO SEARCH THE VEHICLE.

While the standard to conduct a traffic stop is reasonable suspicion, the Fourth Amendment requires officers to possess probable cause to conduct a warrantless search of a vehicle. *United States v. Vqsquez-Castillo*, 258 F.3d 1207, 1212-13 (10th Cir. 2001). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) (internal quotation marks and emphasis omitted). The Supreme Court has stated that "probable cause to search [exists] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

### a. Defendant Has Waived Any Argument Related to the Lack of Probable Cause.

In her Motion to Suppress, Defendant does not challenge the conclusion that officers had probable cause. (*See generally* Doc. 77.) Rather, Defendant challenges (i) the initial

stop; (ii) the delay in getting a K9 Team to the site; and (iii) the movement of the vehicle to a secondary site. (*Id.* at 2.) This third argument is only presented in conclusory fashion without any case citations or support for it being a ground for suppression. (*See id.* at 9-10.) For the reasons set forth above, *see supra* at 7-10, Defendant has waived any argument concerning the presence or absence of probable cause.

**b.      Probable Cause Existed When the Marshalls Bag Was Observed in the Red Toyota.**

Based on the circumstances described above, law enforcement had at least reasonable suspicion, if not probable cause, that Defendant and Golston were engaged in drug trafficking prior to the traffic stop. Specifically, law enforcement had observed a meeting between Stapleton and Annesley at the Inn and subsequently seized approximately 10 kilograms of methamphetamine inside a Marshalls bag. (*See* Exhibit 1.) After the seizure of that methamphetamine, officers observed a meeting between Golston and Annesley at the same location and observed Golston place a Marshalls bag in the passenger side of the vehicle. (*See* Exhibit 2.) Given the similarities of the meetings, officers had probable cause that Defendant and Golston possessed contraband in the vehicle.

This is further strengthened by the observation of the same Marshalls bag in plain view. As stated in Agent Jehle's report:

> I approached the vehicle after marked units had stopped it and could see a Marshalls bag on the front passenger floorboard. Prior to this traffic stop, and on the same day, OBN Agents had Logan STAPLETON stopped on a traffic after meeting with ANNESLEY, and we recovered approximately 10 kilograms of suspected methamphetamine from STAPLETON'S vehicle inside the same type of Marshalls shopping bag.

(*Id.* at 2; *see also* Exhibit 4 at 4 ("Other officer's [*sic*] and myself were notified by DEA/OBN officers that there was a good amount of methamphetamine in the vehicle. I did not search the vehicle. I did observe a White canvas bag in the floor board of the passenger side of the vehicle during the traffic stop.) Body camera footage also demonstrates that the Marshalls bag was in plain view at the time of the stop. (*See* Exhibit 6.) Based on the totality of the circumstances, law enforcement had probable cause to search the vehicle before the traffic stop or, at a minimum, shortly after the traffic stop had occurred.

**c.     Probable Cause Existed Based on the Odor of Marijuana.**

When officers approached the red Toyota, they detected the odor of marijuana and observed containers consistent with the transport and distribution of marijuana. (*See* Exhibit 4 at 3-4.) Officer Layman stated that he "approached the vehicle and smelled a strong odor of marijuana and [he] also saw white containers commonly used in the sale of marijuana." (*Id.* at 4.) Sgt. Beloncik stated that when Golston "rolled the window down, [he] could smell a strong odor of what [he] knew to be green marijuana coming from the recently rolled down window. [He] had previously not smelled the marijuana odor in the air." (*Id.* at 3.) This is consistent with the conversation captured on body camera footage, in which Agent Jehle, Sgt. Beloncik, and Deputy Hefley all confirm that they detected the odor of marijuana, and Sgt. Beloncik notes that when Golston rolled down the window he could smell marijuana coming from the car." (Exhibit 8 at 00:47-01:00.) Defendant was asked if she had a medical marijuana card, and she responded that she did not smoke. (Exhibit 4 at 4.) Golston did claim to have a medical marijuana card.

"An officer's detection of the smell of drugs . . . in a car is entitled to substantial weight in the probable cause analysis and can be independently sufficient basis for probable cause." *United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2001). "In a case involving raw marijuana, [the Tenth Circuit] has held that 'the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage.'" *Downs*, 151 F.3d at 1303 (quoting *United States v. Morin*, 949 F.2d 297, 300 (10th Cir. 1991)).

This general rule has not changed in light of Oklahoma's authorization of the use of marijuana for medical purposes. *See United States v. Boykins*, No. CR-23-306-SLP, 2024 WL 101865 (W.D. Okla. Jan. 9, 2024). In that case, the Court relied on the Oklahoma Criminal Court of Appeals decision, which held that "[t]he decriminalization of marijuana possession for those holding medical marijuana licenses ***in no way affects a police officer's formation of probable cause*** based on the presence or odor of marijuana." *Id.* at *5 (quoting *State v. Roberson*, 492 P.3d 620, 623 (Okla. Crim. App. 2021)) (alteration and emphasis in *Boykins*)).

As such, based on the Tenth Circuit's long-standing precedent, the officers had probable cause to search the red Toyota after detecting the odor of marijuana and observing containers consistent with the sale of marijuana.

**d.    Probable Cause Existed Based on the Positive Alert from the K9.**

Probable cause existed prior to the K9 Team arriving on sight for the reasons set forth above. However, even if probable cause did not exist before the K9 alerted, it did exist following the alert.

20

In *Florida v. Harris*, the Supreme Court considered "how a court should determine if the 'alert' of a drug-detection dog during a traffic stop provides probable cause to search a vehicle." 568 U.S. 237, 240 (2013). The Supreme Court concluded that a government can demonstrate probable cause by either presenting evidence that "a bona fide organization has certified a dog" or "the dog has recently and successfully completed a training program." *Id.* at 246-47. Ultimately, "[i]f the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause." *Id.* at 247-48.

Here Deputy Hefley's report provided details concerning the training and certification of his assigned K-9:

> I am currently assigned a drug detection K-9 since May 2022 by the name of Geri. Geri was certified with the State of Oklahoma in May of 2022 and again in May 2023 as a licensed CDS detector team. Geri is trained and certified to detect the odors of marijuana, cocaine, meth, and heroin. I also attended the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control Accelerated K9 Handler Phase II, 50 hours in December of 2022 with Geri.

(*See* Exhibit 7.) Defendant has not challenged this. As such, a positive alert from this K-9 is sufficient for probable cause. This positive alert occurred in this case. (*See id.*; Exhibit 9.)

The fact that officers moved the red Toyota from the busy intersection where the traffic stop occurred to a nearby parking lot does not impact the analysis. The relocation of a suspect (or vehicle) during a *Terry* stop is authorized where such movement is a reasonable means of achieving the goals of the investigation. *United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006). This principle extends to the relocation of a vehicle

during a traffic stop. *United States v. White*, 584 F.3d 935, 952-56 (10th Cir. 2009). The analysis required is determining whether the actions "were 'reasonably necessary under the totality of the circumstances.'" *Id.* (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994)). In making that determination, the Court must balance the necessity of the actions against the amount of the intrusion. *Id.*

Here, officers relocated the red Toyota from a busy intersection to an adjacent parking lot. (*See* Exhibits 8-9.) As can be seen in the body camera footage, vehicles were passing in close proximity to the red Toyota while the K9 was circling the vehicle. (*See* Exhibit 8.) The environment precluded the K9 from completing its task. (*Id.*) As a result, the officers moved the vehicle a short distance from the street to a nearby parking lot. (*Id.*) This action is authorized under the Fourth Amendment because it was minimally intrusive and served the purposes of the traffic stop. *White*, 584 F.3d at 952-56.

## CONCLUSION

Based on the foregoing, Defendant's motion to suppress [Doc. 77] should be denied without an evidentiary hearing.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

*s/ Matthew P. Anderson*
MATTHEW P. ANDERSON
Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8788 (Office)
(405) 553-8888 (Fax)
matthew.anderson2@usdoj.gov

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2024, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants: Robert Gifford, counsel for Gloria Leshell Bills.


*s/ Matthew P. Anderson*
Assistant United States Attorney